**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JESSICA REYNOLDS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 10-356-LPS/MPT |
| | : | |
| MICHAEL J. ASTRUE, Commissioner | : | |
| of Social Security, | : | |
| | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATION**

## I.    INTRODUCTION

Plaintiff, Jessica Reynolds ("Reynolds") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security (the "Commissioner"), denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § § 401-433, 1381-1383f.  This court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Reynolds and the Commissioner.[1]  Reynolds, in essence, asks this court to direct an award of benefits in her favor or, alternatively, to reverse and remand the Commissioner's decision.[2]  The Commissioner has requested that the court affirm his decision with costs taxed against Reynolds.[3]  For the reasons set forth below, the court

---

[1] D.I. 21, 23.
[2] D.I. 21.
[3] D.I. 23.

recommends that Reynolds' motion will be denied, and the Commissioner's motion will be granted.

## II.     BACKGROUND

### A.     Procedural History

Reynolds filed her claim on March 15, 2007 alleging depression, anxiety and brain damage.[4]  Reynolds' application was initially denied initially and on reconsideration at the pre-hearing administrative levels.[5]  Thereafter, Reynolds requested a hearing before an administrative law judge (hereinafter "ALJ").  A hearing was held on April 21, 2009.[6]  The ALJ issued a decision dated July 27, 2009 concluding that Reynolds was not disabled and denying benefits.[7]  Reynolds timely requested review of the ALJ's decision by the Appeals Council, and the Appeals Council denied the request for review without substantive explanation.[8]  Thus, the July 27, 2009 decision of the ALJ became the final decision of the Commissioner.[9]

On April 28, 2010, Reynolds filed a complaint seeking judicial review of the ALJ's July 27, 2009 decision.[10]  On January 10, 2011, Reynolds moved for summary judgment.[11]  In response, the Commissioner filed a cross-motion for summary judgment, and a combined opening brief in support of his cross-motion and opposition to Reynolds'

---

[4] D.I. 16 at 174.
[5] *Id.* at 48-51, 53-61.
[6] *Id.* at 22-47.
[7] *Id.* at 9-21.
[8] *Id.* at 1-3.
[9] 20 C.F.R. § § 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 107 (2000).
[10] D.I. 2.
[11] D.I. 21.

motion requesting the court to affirm the ALJ's decision.[12]  Reynolds did not file a reply brief.  Accordingly, the court will proceed to address the merits of Reynolds' claim.

### B.    Non-Medical History

Reynolds is currently 34 years old.  She has a general equivalency diploma from high school and about three semesters in college studying business.[13]  Reynolds' work experience reached the level of substantial gainful activity and her employment constitutes past relevant work.  Reynolds stopped working in 2006 because of her mental health issues (numerous "nervous breakdowns") and her employer's dissatisfaction with her.[14]  Reynolds' last position held was with American International Processing in December 2006.[15]

### C.    Medical History

Reynolds provided medical records from an unknown source for the time period of December 4, 2001 through March 15, 2007.  The records indicate that Reynolds has a history of neck pain as well as anxiety.  At her initial visit on December 4, 2001 she was diagnosed as suffering from panic attacks and neck strain.  She was prescribed Paxil and referred to a psychiatrist.[16]  On December 18, 2001, she reported feeling better and anxiety was controlled.[17]  She was "sleeping well, working well and performing her duties at work well."[18]  She had started physical therapy for her neck and had not yet consulted

---

[12] D.I. 23, 24.
[13] D.I. 16 at 25.
[14] *Id.* at 26.
[15] *Id.* at 160.
[16] *Id.* at 249.
[17] *Id.* at 248
[18] *Id.* at 248.

with a psychiatrist.[19]

Reynolds' records indicate that she was doing well with her anxiety until November 2003. At that time, her doctor prescribed Wellbutrin and "gave her temporary disability for 4 months."[20] In December 2003, Reynolds returned to her physician complaining of pain and anxiety. She reported a consult was scheduled with a psychiatrist in January 2004.[21] No further complaints of anxiety occurred until May, 2004 when she faced a "legal situation with school regarding her children."[22]

In July 2004, Reynolds became pregnant and Clonazepam was temporarily discontinued.[23] At the conclusion of her pregnancy, Clonazepam was re-prescribed in March 2005.[24] No further complaints are noted until November 2006 when Reynolds' anxiety and depression were "no longer controlled with Clonazepam".[25] Her physician increased her dosage of Clonazepam, and as of the date of the last note, March 15, 2007, there is no indication that Clonazepam did not control her anxiety.[26]

Reynolds submitted imaging reports from Jennersville Regional Hospital. The CT scan of her brain dated June 9, 2004 showed a "small hyperattenuated focus adjacent to the right caudate nucleus, which is suspicious for a small parenchymal contusion."[27] The x-rays of her right hand taken on October 21, 2006 were unremarkable.[28]

---

[19] *Id.*
[20] *Id.* at 246.
[21] *Id.*
[22] *Id.* at 244.
[23] *Id.*
[24] *Id.* at 243.
[25] *Id.* at 241.
[26] *Id.*
[27] *Id.* at 252.
[28] *Id.* at 250.

Reynolds imaging reports from the Chester County Hospital of her lumbosacral spine and cervical spine taken January 14, 2004 show no abnormalities.[29]  The imaging report of her right knee also was normal.[30]

Reynolds was admitted to the Horsham Clinic from February 19, 2007 until February 23, 2007.  She was committed for inpatient treatment by her mother.  Her GAF at admission was 25[31] and her GAF at discharge was 55.[32]  She was diagnosed as suffering from "mood disorder, not otherwise specified" and "pharyngitis".  According to the clinic record, prior to her admission, Reynolds was taking Klonopin on an as needed basis to control anxiety, with no suicidal or homicidal thoughts and no psychotic symptoms.[33]  During her admission at Horsham, Lexapro and Trazodone were administered.  Klonopin was not needed since Reynolds reported that she felt well during this hospitalization.  In the Horsham record, Reynolds is described as "social with other patients and staff" and "[t]here was no material to present to the court to justify continuation of inpatient treatment."[34]  She was discharged with medications, and instructed to continue outpatient treatment, with no physical or diet restrictions.[35]

---

[29] *Id.* at 251.

[30] *Id.* at 253.

[31] "Behavior is considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)"  THE AMERICAN DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV), 32 (4th Ed. 1994).

[32] "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." THE AMERICAN DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV), 32 (4th Ed. 1994).

[33] D.I. 16 at 233.

[34] *Id.* at 234.

[35] *Id.*

On March 5, 2007, an adult intake assessment was completed by Tonya Deveney, M.Ed., presumably affiliated with Human Services, Inc..[36] The assessment indicates that "Jessica is anxious. She doesn't feel depressed. She has panic attacks . . . . Jessica took [C]lonazepam 2mg 2x/day for 2 years for her anxiety and panic attacks . . . . She has not taken this med since her hospitalization at Horsham Clinic, as advised by the psychiatrist there."[37] It is also noted that she has "no suicidality no homicidality no access to weapons".[38] The diagnostic impressions at that time were that she had "rapid, pressurized speech . . . . was tearful, although . . . not depressed. She was hyperalert and dramatic . . . . she did not want to take meds, because of just getting off Clonazepam while she was at Horsham Clinic."[39] Outpatient treatment with Dr. Donovan was recommended.[40] Her presentation at intake was noted as "attentive, cooperative, good eye contact."[41] Reynolds continued to treat approximately once a week with Human Services and at her last visit, her therapist reported her "mood calmer and more relaxed than previous sessions."[42]

On January 17, 2008, Reynolds was seen by the Albert Einstein Healthcare Network for depression and an attempted suicide.[43] On January 18, 2008, Reynolds was discharged after she reported no further suicidal ideation. She still had depressive

---

[36] *Id.* at 256-260.
[37] *Id.* at 256.
[38] *Id.* at 257.
[39] *Id.* at 260.
[40] *Id.*
[41] *Id.* at 261.
[42] *Id.* at 266.
[43] *Id.* at 291.

symptoms.[44]

On January 21, 2008, Reynolds was admitted to Brooke Glen Behavioral Health and discharged on January 29, 2008.[45]  Reynolds' GAF on admission was 25.  On discharge, her GAF was 50.[46]  During that hospitalization, Reynolds underwent a thorough neurological examination which found no abnormalities.[47]  The record noted that none of her medical problems required follow up.[48]

On April 10, 2008, Reynolds was seen by Carl D. Herman, M.D.[49]  In his report, Dr. Herman noted that Reynolds is "accurately oriented and in full contact with her environment; intelligence is within the normal range with no evidence of organic brain dysfunction by psychiatric screening.  Immediate retention is intact, short term memory very good (4 out of 5 items) . . . .  Attitude is pleasant and cooperative with no hostility no dependence."[50]  Dr. Herman's diagnosis of Reynolds was "[b]ipolar disorder.  History of ADHD.  Complex seizure disorders.  Jessica suffers from mood swings and extreme instability of her emotional state . . . .  Prognosis is guarded for change.  She is capable of managing her benefits."[51]

On October 20, 2008, Reynolds began treatment with Mid-Atlantic Behavioral

---

[44] *Id.* at 292.
[45] *Id.* at 308-320.
[46] Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). THE AMERICAN DIAGNOSTIC ASSOCIATION DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV), 32 (4th Ed. 1994).
[47] D.I. 16 at 309.
[48] *Id.* at 309.
[49] *Id.* at 321-325.
[50] *Id.* at 322.
[51] *Id.* at 322.

Health.[52]  At her initial evaluation on October 20, 2008, Andrew Donohue, D.O. noted that

> The client is frail.  She is well oriented in all spheres . . . .  Mood is euthymic (sic).  She presented herself in an appropriate fashion . . . .  Recent memory is normal . . . . Regarding conceptual disorganization, there is none evident . . . .  Attitude can be described as dramatic . . . . Attention/Concentration is characterized by ability to attend and maintain focus.  Regarding impulse control the client is reflective and able to resist urges.[53]

Dr. Donohue diagnosed Reynolds as suffering from major depressive disorder, recurrent, unspecified, chronic (principal), physical abuse of child, physical abuse of adult, generalized anxiety disorder, post-traumatic stress disorder (provisional), personality change due to head injuries, personality disorder NOS, partial complex seizure disorder status post head injuries, parental, employment.  He further indicated that her current GAF was 55,[54] with her highest and lowest GAF in the past year was also 55.  Dr. Donohue found no evidence of suicidal or physical violence risk, prescribed Depakote and Clonazepam and to continue her current treatment plan.[55]

Reynolds was seen by Dr. Donohue on February 13, 2009.  At that time, Reynolds advised that she felt better and her depression had improved.[56]  Dr. Donohue continued with his original diagnosis, treatment plan and medications.

On February 13, 2009, Dr. Donohue noted that Reynolds' depression had "gotten a lot less."[57]  He also recorded that Clonazepam improved the two main problems,

---

[52] *Id.* at 358-365.
[53] *Id.* at 358.
[54] *See* footnote 32.
[55] D.I. 16 at 360.
[56] *Id.* at 362.
[57] *Id.* at 364.

anxiety and insomnia, and that based on Reynolds' comments, her depression, when present, was situational, limited to dealing with adversity.[58] Dr. Donohue continued with the same treatment plan and medications.[59]

## D.    Medical Opinions Regarding Residual Function Capacity

On April 24, 2008, Paul Taren, Ph.D. reviewed Reynolds' records and issued a functional capacity assessment,[60] Dr. Taren determined that "[t]he claimant is able to carry out simple, routine tasks despite the limitations resulting from his (sic) impairments."[61]

## E.    The Administrative Hearing

A hearing was held before the ALJ on April 21, 2009.[62] Reynolds was represented by counsel and testified at the hearing. In addition, a vocational expert testified.

### Reynolds' testimony

At the hearing, Reynolds testified that she is receiving treatment at Mid-Atlantic Behavioral Health for post traumatic stress syndrome, anxiety, depression and a personality change due to her brain injuries.[63] She sees her mental health doctor weekly.[64] She also claimed physical problems with neck, back and knee pain and goes to physical therapy three times per week.[65] She takes Depakote and Clonazepam for

---

[58] *Id.* at 364.
[59] *Id.* at 365.
[60] *Id.* at 326-341.
[61] *Id.* at 341.
[62] *Id.* at 22-47.
[63] *Id.* at 26.
[64] *Id.* at 32.
[65] *Id.* at 32.

seizures and anxiety, respectively.[66]  Her medications do not alleviate her symptoms and the side effect of the medications are drowsiness and nausea.[67]

She testified that due to her brain injuries she has severe anxiety and depression.  She is also fearful of new relationships and does not trust people due to childhood trauma.[68]  She further testified that she cannot accept criticism and becomes over emotional; her attention span is short and she cannot finish small jobs; and her depression interrupts her sleep.[69]  She also claimed that anxiety causes blackouts and has trouble controlling her bowels.[70]  She is restless and has a hard time sitting for more than a half hour to an hour.[71]

At the time of the hearing, Reynolds was the sole caregiver for her four year old daughter.[72]  She lives with her mother and they collectively maintain the household.[73]  Prior to the hearing, the last time Reynolds had been hospitalized was in May 2008 for a suicide attempt.[74]

**Vocational expert's testimony**

Following Reynolds' testimony, the ALJ consulted a vocational expert, Dianna Simms.  Simms classified Reynolds' past work as an office clerk as semi-skilled at a specific vocational preparation (hereinafter referred to as "SVP") level 3 and light

---

[66] *Id.* at 36.
[67] *Id.* at 29-30.
[68] *Id.* at 26-27.
[69] *Id.* at 27-28.
[70] *Id.* at 34.
[71] *Id.* at 36.
[72] *Id.* at 31.
[73] *Id.* at 37.
[74] *Id.* at 38-39.

exertion; her past work as a deli clerk as unskilled and light and her past work as a customer service representative as semi-skilled, SVP 3 or 4 and sedentary in exertion. She also testified that Reynolds had transferrable skills from her data entry and receptionist positions that could be used in conjunction with office type work.[75]

The ALJ asked the vocational expert to consider the following hypothetical person:  25 years old at the date of onset with a 12th grade education plus a couple of semesters in business courses in college, left handed and suffers generally from depression and anxiety.  The person also has some bowel problems, neck, back and knee problems, moderate depression and pain with frequent mood swings, panic attacks, and occasional headaches which are somewhat relieved by medication without significant side effects, except for drowsiness and tiredness.  The ALJ further limited the hypothetical to someone who needs a simple, routine, unskilled job, with low stress, concentration and memory and is able to attend tasks and complete schedules secondary to depression.  The hypothetical claimant must also be mildly to moderately limited in her ability to perform her activities of daily living (hereinafter referred to as "ADL"), interact socially and maintain concentration, persistence and pace.  Further restrictions applicable to this hypothetical person include lifting 10 pounds frequently, with 20 pounds on occasion; sit for thirty minutes; standing for thirty minutes consistently on an alternate basis during an eight hour day, five days a week; needing to avoid heights and hazardous machinery due to medication and involving little interaction with co-workers, supervisors and the public due to anger problems.[76]

---

[75] *Id.* at 43.
[76] *Id.* at 44-45.

In response, the vocational expert testified that such a person could perform the following jobs: (1) unskilled mail clerk, with 800 jobs locally and 150,000 in the national economy; (2) light unskilled office helper positions, with approximately 500 jobs locally and 250,000 in the national economy; (3) sedentary unskilled document preparer with 900 jobs in the region and 375,000 in the national economy; and (4) a sedentary, unskilled addresser, with 250 jobs locally and 190,000 in the local economy.[77] The vocational expert further testified that Reynolds could not perform her past relevant work.[78]

## F.    The ALJ's Findings

On July 27, 2009, the ALJ issued the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.

2.    The claimant has not engaged in substantial gainful activity since December 31, 2006, the alleged onset date (20 CFR 404.1571 *et seq.* And 416.971 *et seq.*).

3.    The claimant has the following severe impairments: depression and anxiety (20 CFR 404.1520© and 416.920©).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform simple routine light jobs with little interaction with coworkers and the public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

---

[77] *Id.* at 45.
[78] *Id.* at 45-46.

7. The claimant was born on February 28, 1977 and was 25 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).[79]

## III. LEGAL STANDARDS

### A. Motion For Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In determining the appropriateness of summary judgment, the Court must "review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."[80] If the court is able to determine that "there is no genuine issue as to any material fact" and that the movant is entitled to judgment as a matter of law,

---

[79] *Id.* at 14-21.
[80] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted).

summary judgment is appropriate.[81]

## B.    Review Of The ALJ's Findings

This court's review is limited to determining whether the final decision of the

Commissioner is supported by substantial evidence.

> Substantial evidence is less than preponderance but more than a
> mere scintilla.  It is such relevant evidence as a reasonable mind
> would accept as adequate support for conclusion.  It must do more
> than create a suspicion of the existence of a fact to be established . .
> . it must be enough to justify, if the trial were put to a jury, a refusal
> to direct a verdict when the conclusion sought to drawn from it is one
> of fact to the jury.[82]

The Supreme Court has embraced a similar standard for determining summary

judgment pursuant to Fed. R. Civ. P. 56:

> The inquiry performed is the threshold inquiry of determining
> whether there is a need for a trial–whether, in other words, there are
> any genuine factual issues that properly can be resolved only by a
> finder of fact because they may reasonably be resolved in favor of
> either party.
>
> This standard mirrors the standard for a directed verdict under
> Federal Rule of Civil Procedure 50(a), which is that the trial judge
> must direct a verdict if, under the governing law, there can be but
> one reasonable conclusion as to the verdict.  If reasonable minds
> could differ as to the import of evidence, however, a verdict should
> not be directed. [83]

> Overall, this test is differential and this court must give
> deference to agency inferences from facts if those inferences are
> supported by substantial evidence, even where a court acting *de
> novo* might have reached a different result.

> Furthermore, evidence taken as a whole must be sufficient to

---

[81] *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (internal quotation
marks omitted).

[82] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).

[83] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

support a conclusion by a reasonable person, not just the evidence
consistent with agency's decision.

Thus, a single piece of evidence will not satisfy the substantiality test
if the [Commissioner] ignores, or fails to resolve, a conflict created
by countervailing evidence. Nor is the evidence substantial if it is
overwhelmed by other evidence – particularly certain types of
evidence (e.g. that offered by treating physicians) – or if it really
constitutes not evidence but a mere conclusion.[84]

Where, for example, countervailing evidence consists primarily of the claimant's
subjective complaints of disabling pain, the ALJ "must consider the subjective pain and
specify his reasons for rejecting these claims and support his conclusion with medical
evidence in the record."[85]

Cross-motions for summary judgment are no more than a claim by each side that
it alone is entitled to summary judgment, and the making of such inherently
contradictory claims does not constitute an agreement that if one is rejected the other is
necessarily justified or that the losing party waives judicial consideration and a
determination whether genuine issues of material fact exist.[86]

Moreover, "[t]he filing of cross-motions for summary judgment does not require
the court to grant summary judgment for either party."[87]

IV.    DISCUSSION

A.      Disability Determination Process

Disability Determination Standard

The Supplemental Social Security Income (SSI) program was enacted in 1972 to

---

[84] *Monsour Med. Ctr. v . Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).
[85] *Matullo v. Brown*, 926 F.2d 240, 245 (3d Cir. 1990)
[86] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).
[87] *Krups v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

assist "individuals who have attained the age of 65 or are blind or disabled" by setting a minimum income level for qualified individuals.[88]  A claimant – in order to establish SSI eligibility – bears the burden of proving that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of or not less than twelve months."[89]  Moreover, "the physical or mental impairment or impairments must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in significant numbers in the national economy."[90]  Furthermore, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are evidenced by medically acceptable clinical and laboratory diagnostic techniques.[91]

**Five-Step Test.**

The Social Security Administration uses a five-step sequential claim evaluation process to determine whether an individual is disabled.[92]

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  If a claimant is found to be engaged in substantial activity, the disability claim will be

---

[88] *See Sullivan v. Zebley*, 493 U.S. 521, 524 (1990) (citing 42 U.S.C. § 1381 (1982 ed.)).
[89] 42 U.S.C. § 423(d)(1)(A).
[90] 42 U.S.C. § 423(d)(2)(A).
[91] 42 U.S.C. § 423(d)(3).
[92] *See* 20 C.F.R. §416.920(a); *see also Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999).

denied.

In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits. In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work. If the claimant is unable to resume her former occupation, the evaluation moves to the final step.

At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.[93]

If the ALJ determines that a claimant is disabled at any step in the sequence, the analysis stops.[94]

**Weight Given to Treating Physicians**

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight."[95] Moreover, such reports will be given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory

---

[93] *Plummer*, 186 F.3d at 427.
[94] *See* 20 C.F.R § 404.1520(a)
[95] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

diagnostic techniques and is not inconsistent with the other substantial evidence on record.[96]

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[97]  If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[98]

However, a statement by a treating source that a claimant is "disabled" is not a medical opinion: rather, it is an opinion on an issue reserved to the ALJ because it is a finding that is dispositive of the case.[99]  Therefore, only the ALJ can make a disability determination.

### Factors in Evaluating Credibility[100]

A claimant's statements and reports from medical sources and other persons along with any other relevant information in the record, provide the ALJ with an overview of the subjective complaints, and are elements to the determination of credibility.

Consistency with the record, particularly medical findings, supports a claimant's credibility.  Since the effects of symptoms can often be clinically observed, when

---

[96] *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).
[97] *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).
[98] *Plummer*, 186 F.3d at 429.
[99] *See* 20 C.F.R. § 416.927 (e)(1).
[100] *See* SSR 96-7p.

present, they tend to lend credibility to a claimant's allegations. Therefore, the adjudicator should review and consider any available objective medical evidence concerning the claimant's symptoms in evaluating the claimant's statements. An applicant's claims may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show noncompliance with prescribed treatment.

Findings of fact by state agency medical and psychological consultants and other physicians and psychologists regarding the existence and severity of impairments and symptoms, and opinions of non-examining physicians and psychologist are also part of the analysis. Such opinions are not given controlling weight. However, the ALJ, although not bound by such findings, may not ignore them and must explain the weight afforded those opinions in his decision.

Credibility is one element in determining disability. The ALJ must apply his finding on credibility in step two of the five-step disability determination process, and may use it at each subsequent step.

The decision must clearly explain – provide sufficiently specific reasons based on the record – to the claimant and any subsequent reviewers, the weight afforded to the claimant's statements and the reasons therefore.

The law recognizes that the claimant's work history should be considered when evaluating the credibility of his testimony or statements.[101] A claimant's testimony is

---

[101] *See* 20 C.F.R. § 404.1529(a)(3)

accorded substantial credibility when he has a long work history, if it is unlikely that, absent disability, he would have ended employment.[102]

**Medical Expert Testimony**

The onset date of disability is determined from the medical records and reports and other similar evidence, which requires the ALJ to apply informed judgment.[103] "At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred."[104]

**B.    Whether The ALJ's Decision Is Supported By Substantial Evidence**

By her motion, Reynolds asks that the court acknowledge that her disabilities are severe and permanent and that they can and probably will result in death.  Specifically, she alleges that she suffers from seizure disorder, history of stroke, depression and borderline personality disorder.  As indicated in her opening brief, Reynolds claims her seizures have become more frequent and severe and she was recently hospitalized on January 1 (presumably in 2011) at Christiana Hospital in the stroke ward.  She also asserts loss of speech, sight and mobility as a result of her illnesses.[105]

However, Reynolds has not provided any medical evidence to support her complaints to this court, and there is no indication that she ever provided documents to

---

[102] *See Podedworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984) citing *Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3d Cir. 1981).  In *Podedworny*, the claimant worked for thirty-two years as a crane operator for one company.  He had a ninth grade education and left his employment after the company physicians determined that his symptoms of dizziness and blurred vision prevented him from safely performing his job.

[103] *See* SSR 83-20.

[104] *Id.*

[105] D.I. 21.

the ALJ regarding any history of stroke, nor did she testify at the administrative hearing about that condition.  She did provide records regarding her seizure disorder.  The ALJ reviewed those records provided and noted that Reynolds' treating doctors indicated that her seizures were controlled when Reynolds is compliant.[106]  The ALJ also found that Reynolds' depression and anxiety are severe impairments, but that her "impairments, considered singly and in combination, do not meet or medically equal the criteria of listings in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926)."[107]

In making his determination, the ALJ thoroughly analyzed the records presented before him and set forth his reasons for accepting or rejecting the opinions of the physicians.  In making a disability determination, the ALJ "may reject the opinion of a treating physician if the opinion is not supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record."[108]  The ALJ must adequately explain any reasons for rejecting a treating physician's opinion, and when doing so, must consider factors such as "length of treatment relationship, nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record evidence, and specialization of the opining physician and other factors the plaintiff raises, in determining how to weigh the physician's opinion."[109]  The Third Circuit has explained

---

[106] D.I. 16 at 14.

[107] *Id.* at 15.

[108] *Sanchez v. Barnhart*, 388 F. Supp.2d 405, 411 (D.Del. 2005) (citing *Fargnoli v. Halter*, 247 F. 3d 34, 42 (3d Cir. 2001)).

[109] *Id.* at 411-12 (citing 20 C.F.R. § 404.1527(d)(2)-(6)).

that although an ALJ is not permitted to reject an examining physician's conclusions on credibility alone, he "may afford a treating physician's opinion more or less weight depending on the extent to which supporting explanations are provided."[110]

In the present matter, the ALJ reviewed plaintiff's medical history and symptoms and determined that she has two severe impairments, depression and anxiety.[111] Nonetheless, the ALJ found that the combination of impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1, and that plaintiff could still perform simple routine light jobs with little interaction with coworkers and the public.[112]  The ALJ's decision listed specific instances where both Reynolds' doctors and notes or Reynolds' own testimony support his determination.[113] The ALJ did not discredit the doctors' opinions.  Instead, he accorded more weight to the conclusions that were supported by the medical evidence and less weight to those that were contradicted or unsupported by the objective medical records.[114]  The ALJ

---

[110] *Morales v. Apfel*, 22 F.3d 310, 318 (3d Cir. 2000); *Plummer*, 186 F.3d at 429.
[111] D.I. 16 at 14.
[112] D.I. 16 at 16.
[113] D.I. 16 at 16-19.
[114] *Id.* (The ALJ referenced Reynolds' testimony concerning her ADL in that she cares for herself independently, shares household chores with her mother and cares for her four year old daughter; but she has no friends, has days where she cannot get out of bed, and three to four times a week does not get dressed.  While the ALJ conceded that Reynolds' medically determinable impairments could cause the alleged symptoms, her statements regarding the intensity, persistence and limiting effects were not consistent with the medical records.  Specifically, Dr. Herman's April 2008 report indicates that Reynolds is fully oriented with normal intelligence and no evidence of organic brain dysfunction; her attitude is pleasant and cooperative with no hostility or dependence.  Dr. Donahue's records from September, 2008 through April, 2009 show that her depression responds well to medication, is situational, and is in relative remission.  Dr. Donahue also notes that Clonazepam helps with anxiety and insomnia.).

provided explanations and references to the medical record in each instance that Drs. Herman's and Donohue's opinions were given less weight.[115]

When substantial evidence supports the ALJ's findings of fact, they are considered conclusive.[116] The ALJ noted that the medical record does not support the functional limitations as asserted by Reynolds. The medical records note that she was improving and that her GAF remained around 50. The ALJ also noted that in the records Reynolds confirmed that Clonazepam helped with anxiety and insomnia, her depression was "situational," and she could enjoy life when not dealing with adversity.[117] Since the ALJ's determination is supported by the record, the court finds that the ALJ did not impermissibly substituted his own opinion for that of Reynolds' physicians.[118] Although a "treating [physician's] opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance," a doctor's opinion "about issues reserved to the Commissioner must never be ignored."[119] Any "decision must explain the consideration given" to the treating physician's analysis.[120] Here, the ALJ properly weighed the treating doctors' opinions and Reynolds' testimony and provided the bases for his determination as required under 20 C.F.R. § 404.1527. His determinations are supported by substantial evidence as contained in the record.

---

[115] *Id.*

[116] *Monsour,* 806 F. 2d at 1190.

[117] D.I. 16 at 18.

[118] *Gooden v. Barnhart*, No. 01-570-JF, 2002 U.S. Dist. LEXIS 27035, at *26 (D. Del. Jul. 18, 2002) (*citing, Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991)).

[119] SSR 96-5P.

[120] *Id.*

**ORDER**

Consistent with the findings contained in the Report and Recommendation of the same date,

IT IS RECOMMENDED that plaintiff's motion for summary judgment (D.I. 21) be DENIED and defendants' cross motion for summary judgment (D.I. 23) be GRANTED.

Pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72 (b)(1), and D. Del. LR 72.1, any objections to the Report and Recommendation shall be filed within fourteen (14) days limited to ten (10) pages after being served with the same. Any response shall be limited to ten (10) pages.

The parties are directed to the Court's Standing Order in *Pro Se* Matters for Objections Filed under Fed. R. Civ. P. 72 (dated November 16, 2009), a copy of which is found on the Court's website (www.ded.uscourts.gov.)

The Clerk of the Court is directed to cause a copy of the Report and Recommendation and this Order to be mailed to plaintiff, Jessica Reynolds.

Dated: July 12, 2011            /s/ Mary Pat Thynge
                                  UNITED STATES MAGISTRATE JUDGE